1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CORINE J. JEFFERSON,           )    Case No. EDCV 06-960 JC
                               )
                Plaintiff,     )
                               )
        v.                     )    MEMORANDUM OPINION AND
                               )    ORDER OF REMAND
MICHAEL J. ASTRUE,[1]          )
Commissioner of Social         )
Security,                      )
                               )
                Defendant.     )
_____)

## I.    SUMMARY

On September 6, 2006, plaintiff Corine J. Jefferson filed a Complaint seeking review of the Commissioner of Social Security's denial of benefits. The parties have filed a consent to proceed before a United States Magistrate Judge.

This matter is before the Court on the parties cross-motions for summary judgment, respectively ("Plaintiff's Motion") and ("Defendant's Motion"). The Court has taken both motions under submission without oral argument. See Fed. R. Civ. P. 78; L.R. 7-15; September 12, 2006 Case Management Order, ¶ 5.

_____

[1]Michael J. Astrue is substituted as Commissioner of Social Security pursuant to F.R. Civ. Proc. 25(d)(1).

1

1    Based on the record as a whole and the applicable law, the decision of the

2    Commissioner is REVERSED AND REMANDED for further proceedings

3    consistent with this Memorandum Opinion and Order of Remand.  The

4    Administrative Law Judge ("ALJ") erred by rejecting plaintiff's treating physician

5    opinions without offering adequate reasons.

6    **II.    BACKGROUND AND SUMMARY OF ADMINISTRATIVE**

7    **DECISION**

8    On December 13, 2002, plaintiff filed an application for disability insurance

9    benefits ("DIB").  (Administrative Record ("AR") 95-97).  Plaintiff, a 53-year-old

10   former food service worker with a tenth grade education, asserted that she became

11   disabled on May 2, 2002 due to a work-related slip and fall injury that caused

12   plaintiff to have headaches and pain in her neck, shoulder, hands, in her arms to

13   her elbows, upper and lower back, spine, hips, and heels.  (AR 95, 115).  The

14   Social Security Administration denied plaintiff's application initially and upon

15   reconsideration.  (AR 48-49, 64-67, 69-72).   Plaintiff then requested a hearing,

16   which was held before an ALJ on October 27, 2004.  (AR 73, 367-96).  The ALJ

17   examined the medical record and heard testimony from plaintiff (who was

18   represented by counsel), a medical expert, and a vocational expert.  (AR 367-96).

19   On January 20, 2005, the ALJ determined that plaintiff was not disabled at

20   any time through the date of the ALJ's decision.  (AR 53-58).  However, the

21   Appeals Counsel granted plaintiff's application for review and remanded the case

22   for further proceedings.  (AR 61-63).

23   A second hearing was held before the same ALJ on March 15, 2006.  (AR

24   397-429).  The ALJ heard testimony from plaintiff (who again was represented by

25   counsel), a medical expert, and a vocational expert.  (AR 397-429).

26   ///

27   ///

28   ///

2

On March 27, 2006, the ALJ again determined that plaintiff was not disabled.[2] (AR 18-25). Specifically, the ALJ found: (1) plaintiff suffered from the following severe impairment: degenerative disc disease of the lumbar spine (AR 22, 24); (2) plaintiff did not have an impairment or combination of impairments that meets or equals one of the listed impairments (AR 22, 24); (3) plaintiff retained the residual functional capacity to perform a significant range of light work[3] (AR 22, 24); (4) plaintiff was unable to perform her past relevant work (AR 22-23, 24); and (5) there were a significant number of jobs in the national economy that plaintiff could perform. (AR 23, 24-25).

The Appeals Council denied plaintiff's application for review of the ALJ's March 27, 2006 decision. (AR 6-8, 13-14).

## III.    APPLICABLE LEGAL STANDARDS

### A.    Sequential Evaluation Process

To qualify for disability benefits, a claimant must show that she is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. Tackett

---

[2]The ALJ incorporated by reference the summary of medical and nonmedical evidence contained in her January 20, 2005 decision, except to the extent such evidence was specifically modified by the March 27, 2006 decision. (AR 19).

[3]The ALJ determined that plaintiff (i) could lift and carry 20 pounds occasionally, 10 pounds frequently; (ii) could sit six hours in an 8-hour day, stand and walk four hours in an 8-hour day, changing positions at will; (iii) does not need a cane in the workplace; (iv) could occasionally climb stairs, bend, balance, stoop, kneel and crouch; (v) could not climb ladders or crawl; (vi) could do frequent fine and gross manipulation, but no forceful gripping or grasping; and (vii) should avoid unprotected heights and concentrated exposure to extreme cold, wetness or humidity. (AR 22).

1 | v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C.

2 | § 423(d)(2)(A)).

3 |     In assessing whether a claimant is disabled, an ALJ is to follow a five-step

4 | sequential evaluation process:

5 |     (1)   Is the claimant presently engaged in substantial gainful activity?  If

6 |         so, the claimant is not disabled.  If not, proceed to step two.

7 |     (2)   Is the claimant's alleged impairment sufficiently severe to limit

8 |         her ability to work?  If not, the claimant is not disabled.  If so,

9 |         proceed to step three.

10 |     (3)   Does the claimant's impairment, or combination of

11 |         impairments, meet or equal an impairment listed in 20 C.F.R.

12 |         Part 404, Subpart P, Appendix 1?  If so, the claimant is

13 |         disabled.  If not, proceed to step four.

14 |     (4)   Does the claimant possess the residual functional capacity to

15 |         perform her past relevant work?[4]  If so, the claimant is not

16 |         disabled.  If not, proceed to step five.

17 |     (5)   Does the claimant's residual functional capacity, when

18 |         considered with the claimant's age, education, and work

19 |         experience, allow her to adjust to other work that exists in

20 |         significant numbers in the national economy?  If so, the

21 |         claimant is not disabled.  If not, the claimant is disabled.

22 | Stout v. Commissioner, 454 F.3d 1050, 1052 (9th Cir. 2006) (citing 20 C.F.R.

23 | §§ 404.1520, 416.920).

24 |     The claimant has the burden of proof at steps one through four, and the

25 | Commissioner has the burden of proof at step five.  Bustamante v. Massanari, 262

26 |

27 |

28 |     [4]Residual functional capacity is "what [one] can still do despite [ones] limitations" and represents an "assessment based upon all of the relevant evidence." 20 C.F.R. § 404.1545(a).

4

1   F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); see also Burch, 400 F.3d at 679

2   (claimant carries initial burden of proving disability).

3          If, at step four, the claimant meets her burden of establishing an inability to

4   perform past work, the Commissioner must show, at step five, that the claimant

5   can perform some other work that exists in "significant numbers" in the national

6   economy (whether in the region where such individual lives or in several regions

7   of the country), taking into account the claimant's residual functional capacity,

8   age, education, and work experience.[5]  Tackett, 180 F.3d at 1100 (citing 20 C.F.R

9   § 404.1560(b)(3)); 42 U.S.C. § 423(d)(2)(A).  The Commissioner may satisfy this

10  burden, depending upon the circumstances, by the testimony of a vocational expert

11  or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part

12  404, Subpart P, Appendix 2 (commonly known as "the Grids").  Osenbrock v.

13  Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett).

14          **B.     Standard of Review**

15          Pursuant to 42 U.S.C. section 405(g), a court may set aside a denial of

16  benefits only when the ALJ's findings are based on legal error or are not supported

17  by substantial evidence in the record as a whole.  Parra v. Astrue, 481 F.3d 742,

18  746 (9th Cir. 2007); Robbins v. Social Security Administration, 466 F.3d 880, 882

19  (9th Cir. 2006) (citing Flaten v. Secretary of Health & Human Services, 44 F.3d

20  1453, 1457 (9th Cir. 1995)).  Substantial evidence is "such relevant evidence as a

21  reasonable mind might accept as adequate to support a conclusion."  Richardson v.

22  Perales, 402 U.S. 389, 401 (1971) (citations and quotations omitted).  It is more

23  than a mere scintilla but less than a preponderance.  Robbins, 466 F.3d at 882

24  (citing Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990)).

25

26          [5]Whether there are a "significant" number of jobs a claimant is able to perform with her

27  limitations is a question of fact to be determined by a judicial officer.  Martinez v. Heckler, 807
    F.2d 771, 775 (9th Cir. 1986).  See also Barker v. Secretary of Health & Human Services, 882

28  F.2d 1474, 1478 (9th Cir.), as amended (1989) (noting that Ninth Circuit has never established
    the minimum number of jobs necessary to constitute a "significant number").

1    To determine whether substantial evidence supports a finding, a court must
2    "'consider the record as a whole, weighing both evidence that supports and
3    evidence that detracts from the [Commissioner's] conclusion.'"  Aukland v.
4    Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (quoting Penny v. Sullivan, 2 F.3d
5    953, 956 (9th Cir. 1993)).  If the evidence can reasonably support either affirming
6    or reversing the ALJ's conclusion, a court may not substitute its judgment for that
7    of the ALJ.  Parra, 481 F.3d at 746; Robbins, 466 F.3d at 882.

8    **IV.    DISCUSSION**

9    Plaintiff complains that the ALJ failed to consider the opinion of Dr. Jess
10   Mendoza – the treating physician specializing in occupational medicine who
11   treated plaintiff from the day of the accident that allegedly caused her disability
12   (i.e., May 2, 2002) through July 1, 2002.  (Plaintiff's Motion at 2-4) (AR 162-203
13   (Dr. Mendoza's records)).  Specifically, plaintiff complains that the ALJ failed to
14   consider the diagnoses and functional limitations contained in Dr. Mendoza's
15   workers' compensation progress reports in determining plaintiff's limitations.  A
16   review of the record reveals that the ALJ did not give proper consideration to a
17   treating physician's opinion.

18   **A.    The Assessment of Treating Physician Opinions**

19   In general, the opinion of a treating physician is entitled to greater weight
20   than that of a non-treating physician because the treating physician "is employed
21   to cure and has a greater opportunity to know and observe the patient as an
22   individual." Morgan v. Commissioner, 169 F.3d 595, 600 (9th Cir. 1999) (citing
23   Sprague v. Bowen, 812 F.2d 1226, 1230 (9th Cir. 1987)).  The treating physician's
24   opinion is not, however, necessarily conclusive as to either a physical condition or
25   the ultimate issue of disability.  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.
26   1989) (citing Rodriguez v. Bowen, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)).
27   Where a treating physician's opinion is not contradicted by another doctor, it may
28   be rejected only for clear and convincing reasons.  Connett v. Barnhart, 340 F.3d

871, 874 (9th Cir. 2003).[6]  The ALJ can reject the opinion of a treating physician

in favor of a conflicting opinion of another examining physician if the ALJ makes

findings setting forth specific, legitimate reasons for doing so that are based on

substantial evidence in the record.  Id. (citation and internal quotations omitted);

Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (ALJ can meet burden by

setting out detailed and thorough summary of facts and conflicting clinical

evidence, stating his interpretation thereof, and making findings) (citations and

quotations omitted); Magallanes, 881 F.2d at 751, 755 (same; ALJ need not recite

"magic words" to  reject a treating physician opinion – court may draw specific

---

[6]A treating doctor's opinion can be discounted if the opinion is (i) unsupported by the doctor's own treatment notes; (ii) is conclusory, brief, and unsupported by the record as a whole or by objective evidence; and/or (iii) is based on the claimant's subjective complaints which are unsupported or properly discredited by the ALJ.  See Connett, 340 F.3d 871, 875 (9th Cir. 2003) (treating physician's opinion properly rejected where treating physician's treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]"); Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996) (variance between physician's opinion and his own treatment notes may be used to deem opinion untrustworthy), cert. denied, 519 U.S. 1113 (1997); Batson v. Commissioner, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by record as a whole or by objective medical findings); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (ALJ need not accept treating physician's opinion if it is conclusory and brief and unsupported by clinical findings); Burkhart v. Bowen, 856 F.2d 1335, 1339-40 (9th Cir. 1988) (ALJ properly rejected treating physicians' opinion which was unsupported by medical findings, personal observations or test reports); Crane v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ permissibly could reject three evaluations because they were check-off reports that did not contain any explanation of the bases of their conclusions) (citation omitted).  An ALJ may also favor (i) individualized medical opinions over check-off reports; (ii) more recent reports/opinions over older reports/opinions; and (iii) opinions based upon a lengthier treatment relationship over opinions based upon a shorter treatment relationship.  Murray v. Heckler, 722 F.2d 499, 501 (9th Cir. 1983) (expressing preference for individualized medical opinions over check-off reports); 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i) (generally more weight given to opinion of source with lengthier treatment relationship); Stone v. Heckler, 761 F.2d 530, 532 (9th Cir.1985) (earlier medical evaluations, based on claimant's condition several months before, do not constitute substantial evidence to rebut the conclusions of a later report); Osenbrock, 240 F.3d at 1165 (9th Cir. 2001) (treating physicians' most recent medical evaluation indicated that impairment was mild and presented no significant interference with claimant's ability to perform basic work-related activities); but see Young v. Heckler, 803 F.2d 963, 967-68 (9th Cir. 1986) (ALJ properly rejected more recent report which lacked detailed findings and contradicted all earlier medical reports).

1   and legitimate inferences from ALJ's opinion).  "The ALJ must do more than offer

2   his conclusions."  <u>Embrey v. Bowen</u>, 849 F.2d 418, 421-22 (9th Cir. 1988).  "He

3   must set forth his own interpretations and explain why they, rather than the

4   [physician's], are correct."  <u>Id.</u>  "Broad and vague" reasons for rejecting the

5   treating physician's opinion do not suffice.  <u>McAllister v. Sullivan</u>, 888 F.2d 599,

6   602 (9th Cir. 1989).

7        If there is "substantial evidence" in the record contradicting the opinion of

8   the treating physician, the opinion of the treating physician is no longer entitled to

9   "controlling weight."  20 C.F.R. § 404.1527(d)(2).  In that event, the ALJ is

10  instructed to consider certain specified factors in determining the weight to accord

11  the opinion of the treating physician.[7]  <u>See</u> 20 C.F.R. § 404.1527(d)(2)-(6).  Even

12  when contradicted by an opinion of an examining physician that constitutes

13  substantial evidence, the treating physician's opinion is "still entitled to

14  deference."  SSR 96-2p, <u>Orn v. Astrue</u>, 2007 WL 2034287, at *6 (9th Cir. July 16,

15  2007).  "In many cases, a treating source's medical opinion will be entitled to the

16  greatest weight and should be adopted, even if it does not meet the test for

17  controlling weight."  <u>Orn</u>, 2007 WL 2034287, at *6 (citation omitted).

18  **B.    The Medical Records**

19        Dr. Mendoza treated plaintiff by prescribing pain medication and physical

20  therapy in the two months following plaintiff's fall.  (AR 162, 165, 181-82, 184-

21  85, 187-88, 191-92, 197-98, 200-03).  Dr. Mendoza's report from the day of the

22  accident diagnosed plaintiff with a lumbar spine contusion (bruising) and

23  "degenerative disc disease (by history)," and concluded that plaintiff should

24  remain "off work" for the balance of her shift and should be re-evaluated for work

25  status before her next shift.  (AR 200-03).  The next day, Dr. Mendoza reported

26  ────────────────

27        [7]Those factors include the "[l]ength of the treatment relationship and the frequency of
examination" by the treating physician, and the "[n]ature and extent of the treatment

28  relationship" between the patient and the treating physician.  20 C.F.R. §§ 404.1527(d)(2)(i)-(ii),
416.927(d)(2)(i)-(ii).

that plaintiff still had pain, diagnosed plaintiff with trapezium, thoracic and lumbar spine contusion/strain, and concluded that plaintiff could return to work with limitations (i.e., limited stooping and bending, no prolonged standing or walking, limited lifting, pushing and pulling of up to five pounds, provided that plaintiff wear back support). (AR 197-98). Dr. Mendoza ordered x-rays of plaintiff's lumbar and thoracic spine. (AR 198). X-rays taken that day reportedly were within normal limits with no acute findings, and only an incidental notation of "minimal lumbar scoliosis." (AR 206).

Plaintiff returned to Dr. Mendoza on May 8, 2002. (AR 191-92). Dr. Mendoza again noted trapezium, thoracic and lumbar spine contusion/strain and opined that plaintiff could return to work with limitations (i.e., limited stooping and bending, no prolonged walking, limited lifting, pushing and pulling of up to five pounds, and no overhead work, provided that plaintiff wear back support). (AR 191). At plaintiff's next visit on May 13, 2002, Dr. Mendoza opined that plaintiff could return to work with lesser limitations (i.e., limited stooping and bending, limited lifting, pushing and pulling of up to five pounds, and no overhead work, provided that plaintiff wear back support). (AR 187). If no modified work were available, Dr. Mendoza noted that plaintiff would be temporarily totally disabled. (AR 187).

When plaintiff returned to Dr. Mendoza on May 20, 2002, Dr. Mendoza noted that plaintiff was "still sore" and had a limited range of motion. (AR 184). Dr. Mendoza requested an orthopedic consultation. (AR 184). Dr. Mendoza opined that plaintiff could return to work with lesser limitations (i.e., limited stooping and bending, and limited lifting, pushing and pulling of up to five pounds, provided that plaintiff wear back support). (AR 184). Once again, if modified work were unavailable, Dr. Mendoza noted that plaintiff would be temporarily totally disabled. (AR 184). Similarly, Dr. Mendoza's report for plaintiff's

1    May 28, 2002 visit noted that plaintiff suffered from pain but concluded that

2    plaintiff could return to work with the same limitations.  (AR 181).

3         In accordance with Dr. Mendoza's request, plaintiff underwent an

4    orthopedic consultative examination by Dr. Carlos Lugo on June 11, 2002.  (AR

5    169-77).  Dr. Lugo examined plaintiff and reviewed records of her medical

6    treatment to date – which included Dr. Mendoza's records and plaintiff's May 3,

7    2002 x-ray report.  (AR 170).[8]  On examination, Dr. Lugo observed, <u>inter alia</u>, that

8    plaintiff had a significantly decreased range of motion, experienced significant

9    tenderness to palpitation of her extremities and her spine, but her straight leg

10   raising was negative and she displayed no sensory abnormalities with sensation

11   intact to  touch and pinprick in her lower extremities.  (AR 171-72).  Dr. Lugo

12   diagnosed plaintiff with "muscoligamentous strain of the cervical, thoracic and

13   lumbar spine."  (AR 175).  Dr. Lugo recommended that plaintiff continue physical

14   therapy and medications, and undergo an MRI examination of lumbosacral  spine.

15   (AR 176).[9]  Like Dr. Mendoza, Dr. Lugo opined that plaintiff should continue with

16

17        [8]Dr. Lugo summarized Dr. Mendoza's records as follows:

18
19        The patient was seen on the date of the injury, May 2, 2002.  The patient was
          noted to have significant difficulties and significantly decreased range of motion
20        and stiffness of the back.  The patient was given Toradol and placed off work.
          The patient underwent x-ray examination of the lumbar spine with findings of
21        minimal lumbar scoliosis.  The thoracic spine x-rays were negative.  The
          diagnosis was lumbrosacral contusion and degenerative disc disease by history.
22        The patient was subsequently released to modified duties, continued on a physical
          therapy program, and a back support.  The patient was also placed on Vicodin,
23        and Flexeril as well [sic] nonsteroidal anti-inflammatory medication.  Because of
24        significant pain and discomfort an orthopedic consultation was requested.

25   (AR 170).

26        [9]Plaintiff underwent an MRI examination of her lumbar spine on June 20, 2002.  (AR
27   166-67).  The MRI revealed: (i) at L4-5, a dessicated disc with a 4.0 mm central/left paracentral
     bulge containing a tiny focus of T2 hyperintensity, worrisome for acute annulus tear, minimal
28   encroachment into the left neural foramen, an unremarkable right neural foramen, mild facet

                                                                        (continued...)

                                         10

1   modified work duties "consisting of no pushing, pulling or lifting greater than five

2   pounds as well as limited stooping and bending. . . with a back support."   (AR

3   176).

4         Plaintiff returned to Dr. Mendoza on July 1, 2002.  (AR 162, 165).  Dr.

5   Mendoza again diagnosed plaintiff with trapezium, thoracic and lumbar spine

6   contusion/strain and noted degenerative disc disease based upon Dr. Mendoza's

7   review of plaintiff's MRI results.  (AR 162, 165).  Notwithstanding the additional

8   diagnosis, Dr. Mendoza noted that plaintiff could return to work with even lesser

9   limitations than before (i.e., only lifting, pushing or pulling of up to 5 pounds,

10  provided plaintiff wear back support).  (AR 162).  Dr. Mendoza checked that if no

11  modified work were available, plaintiff should be off work.  (AR 162).

12        Plaintiff's next workers' compensation treating physician progress report is

13  from July 11, 2002, by another treating physician, orthopedic surgeon Dr. Vic

14  Osborne.  (AR 163-64).  See also AR 159-61 (Dr. Osborne's supplemental report);

15  AR 165 (Dr. Mendoza's notes providing that plaintiff is a patient of Dr. Osborne).

16  Dr. Osborne reported that plaintiff was "not much better," but noted that his

17  examination of plaintiff was "consistent with marked symptom magnification"

18  given that the MRI shows only mild disc bulges.  (AR 163) (emphasis in original).

19  See also AR 161 ("This patient displays one of the highest levels of symptom

20  magnification and embellishment that I have seen.  I have reassured her that I did

21  not find any evidence of any serious problems.").  Dr. Osborne diagnosed plaintiff

22  with lumbar strain, but concluded that plaintiff could return to work at once with

23  no limitations and discharged plaintiff from his care.  (AR 163).

24

25  _____

26        [9](...continued)

27  degenerative changes, and no evidence of significant nerve root impingement; and (ii) at L6-S1, a
    5.0 mm disc protrusion with a focus of T2 hyperintensity consistent with acute annulus tear, a

28  questionable 6 mm sequestered fragment just to the right of the midline of the protruded disc,
    and neural foramina that are patent bilaterally with no evidence of spinal canal stenosis at that
    site.  (AR 167).

1    Plaintiff continued to complain of pain and went to Dr. Stephen Yegge for

2  an orthopedic evaluation on July 19, 2002.  (AR 269-76).  Dr. Yegge reported that

3  plaintiff was off work, wearing a back brace, taking oral medication for her pain,

4  and assisting herself with a cane when she walked.  (AR 270).  Dr. Yegge noted

5  plaintiff had palpable tenderness, limited flexion, extension and rotation of the

6  thoracic and lumbar spine, limited range of motion in plaintiff's shoulders, was

7  unable to raise her arms, and could not walk on the heels and toes or perform a full

8  squat.  (AR 272-74).  Dr. Yegge diagnosed plaintiff with strain/sprain of the

9  cervical spine and bilateral shoulders and noted to rule out disc bulging.  (AR

10 274).  Dr. Yegge did not review plaintiff's MRI prior to making this diagnosis.[10]

11   Plaintiff returned to Dr. Yegge for an orthopedic re-evaluation on

12 September 9, 2002.  (AR 265-68).  Dr. Yegge reported that plaintiff ambulated in

13 a guarded fashion with a cane, used a back brace, and had limited flexion and

14 extension of her lumbar spine.  (AR 265).  Dr. Yegge reviewed plaintiff's MRI,

15 examined plaintiff, and diagnosed plaintiff with cervical spine and bilateral

16 shoulder strain/sprain, disc protrusions at L4-5 and L5-S1, and noted to rule out

17 bulging disc and radiculopathy of the lower extremities.  (AR 266, 268).  Dr.

18 Yegge referred plaintiff for an EMG/nerve conduction study and for evaluation by

19 a pain management specialist.  (AR 268).  Dr. Yegge instructed plaintiff to remain

20 off work until October 30, 2002.  (AR 268).[11]

21

22   [10]Dr. Yegge prepared a "Primary Treating Physician's Initial Report" following the July
23 19, 2002 visit consistent with his evaluation that found plaintiff should be considered temporarily
   totally disabled.  (AR 269-76, 303-10).
24
25   [11]Plaintiff underwent additional orthopedic consultative evaluations on April 5, 2003 and
   March 24, 2004 (AR 212-15, 278-90).  Although each doctor noted that  plaintiff had tenderness
26 to palpations, limited range of motion, and positive straight leg raising tests (among other tests),
   one examiner – Dr. Kambiz Hannani – opined that plaintiff could lift and carry 20 pounds
27 occasionally and 10 pounds frequently, could stand and walk 6 hours in an 8-hour day and sit for
   6 hours, but required a cane for prolonged distances. (AR 215).  The other examiner – Dr.
28 Humberto A. Galleno – opined that plaintiff could lift, push and carry no more than 15-20
   pounds, could do no jobs requiring bending, stooping, repetitive climbing, kneeling, squatting, or

   (continued...)

12

1    Plaintiff was evaluated for pain management and rehabilitation on
2    October 8, 2002.  (AR 261-64).  The doctor recommended epidural corticosteroid
3    injections.  (AR 263).  In response, plaintiff stated that her pain had reached a
4    tolerable level at the time, but that should her pain increase, she would return to
5    undergo the injections.  (AR 263).
6    At Dr. Yegge's request, plaintiff underwent an electrodiagnostic evaluation
7    on October 15, 2002, which showed normal nerve conduction and no evidence of
8    peripheral neuropathy.  (AR 258-60).
9    Dr. Yegge prepared a "Primary Treating Physician's Permanent and
10   Stationary Report" for plaintiff on July 2, 2003, following a February 24, 2003
11   orthopedic re-evaluation.  (AR 294-301).  Dr. Yegge noted that plaintiff reported
12   constant pain and used a cane.  (AR 295).  Dr. Yegge once again noted palpable
13   tenderness, limited range of motion in plaintiff's cervical and lumbar spine and
14   shoulders, and that plaintiff was unable to raise her arms, could not walk heel to
15   toe, could not perform a full squat, and tested positively on straight leg raising.
16   (AR 295-97, 299).  Dr. Yegge diagnosed plaintiff with sprain/strain of the cervical
17   and lumbar spine and shoulders, mild degenerative disc disease at C2-3, C3-4, C4-
18   5 and C5-6, a 4 mm disc protrusion at L4-5 and a 5 mm disc protrusion at L5-S1.
19   (AR 298).  Dr. Yegge noted that plaintiff had "significant subjective complaints"
20   ///
21   ///
22
23        [11](...continued)
24   crawling, prolonged walking, and could stand or sit no more than 45 minutes without a 10-15
25   minute break in between, concluding that plaintiff should be considered permanently totally
     disabled.  (AR 282).
26
27        A state agency physician also reviewed plaintiff's medical record and completed a
     Physical Residual Functional Capacity Assessment for plaintiff on April 21, 2003. (AR 238-45).
28   The doctor noted that plaintiff had an MRI indicative of degenerative disc disease but found that
     plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, would be required
     to use a cane for prolonged ambulation, and had only occasional postural limitations.  Id.  The
     doctor suggested that plaintiff could perform light work.  (AR 247).

1   but that "only abnormal findings of the lumbar spine [had] been noted." (AR

2   298).[12]  Dr. Yegge opined that plaintiff would be considered "permanent and

3   stationary," given necessary work restrictions (i.e., no heavy lifting, no prolonged

4   upward and downward gazing, no repetitive bending and stooping, and no

5   prolonged weight bearing).  (AR 298, 300).[13]

6        Plaintiff was seen at Kaiser Permanente for chronic low back pain and hand

7   pain on February 28, 2005.  (AR 353).  Her examiner prescribed pain medication

8   as needed, which plaintiff refused.  (AR 353).  Notes from a visit on March 28,

9   2005, indicate that plaintiff refused surgery, was on medications as minimal as

10  possible, and had requested SSI.  (AR 354-55).   Plaintiff returned to Kaiser with

11  complaints of hand pain on December 8, 2005.  (AR 325).  Her physician noted

12  "moderate" and "major" loss of range of motion in plaintiff's cervical and lumbar

13  spine with certain activities, and described plaintiff's prognosis as "poor."  (AR

14  327).  When plaintiff came back to Kaiser for a headache two days later, the

15  examining physician noted no difficulty with ambulation, no neck pain or back

16  pain, normal reflexes and normal range of motion.  (AR 318-24).  Plaintiff

17  returned for a follow up visit concerning her hypertension three days later and

18  complained of lower back pain with lifting over five pounds, and hand pain.  (AR

19  316-17).

20  ///

21  ///

22  ///

23  ///

24

25        [12]A MRI of plaintiff's cervical spine completed on October 31, 2002, revealed no central

26  canal or neural foraminal stenosis.  (AR 209).

27        [13]Dr. Yegge saw plaintiff on July 19, 2002, October 21, 2002, November 21, 2002,

28  December 11, 2002, January 23, 2003, February 24, 2003, July 3, 2003, November 13, 2003,
    January 14, 2004, March 4, 2004.  (AR 249-50, 253, 255-56, 292-93, 294, 302, 303).  On these
    occasions, Dr. Yegge noted continued tenderness and low back, neck and shoulder pain, refilled
    plaintiff's prescriptions, and continued her physical therapy.  Id.

1  **C.     The ALJ Erred in Failing to Address the Opinion of a Treating**
2          **Physician**

3          As plaintiff argues, and as defendant effectively concedes, the ALJ

4  erroneously failed to discuss Dr. Mendoza's reports in either of her opinions.[14]

5  (AR 18-25, 53-55).   Defendant argues that the ALJ's silent rejection of Dr.

6  Mendoza's opinion was harmless because  (i) Dr. Mendoza's opinion and the

7  limitations he noted were identical to those of Dr. Lugo which the ALJ rejected;[15]

8  and (ii) Dr. Mendoza treated plaintiff only for a limited time at the beginning of a

9  nearly two year period during which plaintiff received treatment from multiple

10 other physicians.[16]  (Defendant's Motion at 3-4).  This court cannot agree that the

11 ALJ's disregard and rejection of Dr. Mendoza's opinions was necessarily

12 harmless.[17]

13         First, even assuming that the opinions of Drs. Lugo and Mendoza are

14 identical, it is not fair to assume from the fact that the ALJ rejected the opinion of

15 Dr. Lugo, that the ALJ necessarily also would have rejected the opinion of Dr.

16 Mendoza.  Instead, the ALJ could have concluded that the two opinions

17 corroborated one another and viewed that as a reason to accept both such opinions.

18

19         [14]Although the ALJ, in her October 26, 2005 decision, did reference records from the
20 Occupational Orthopedic Medical Group where Dr. Mendoza practiced, the ALJ focused solely
21 on Dr. Lugo's and Dr. Osborne's opinions.  (AR 53-54).

22         [15]In support of this contention, defendant improperly cites an unpublished Ninth Circuit
   opinion.  (Defendant's Motion at 4).  See U.S. Ct. App. 9th Cir. Rule 36-3(b).  This Court has
23 not relied on such unpublished opinion in reaching its decision.

24         [16]Defendant also notes that the ALJ's opinion was, to some degree consistent with Dr.
25 Mendoza's opinion, and that Dr. Mendoza's opinion of disability was of little probative value
   because a physician's statement of disability is not dispositive. (Defendant's Motion at 3).  While
26 defendant may well be correct, this does not cure the ALJ's failure to explain the reasons for
27 rejecting the other portions of Dr. Mendoza's opinion.

28         [17]The harmless error rule applies to the review of administrative decisions regarding
   disability.  See Batson v. Commissioner, 359 F.3d at 1196 (applying harmless error standard);
   see also Stout v. Commissioner, 454 F.3d at 1054-56 (discussing contours of application of
   harmless error standard in social security cases).

1   Moreover, because Dr. Lugo did not have the benefit of considering the results of
2   an MRI, which Dr. Mendoza did consider in rendering an opinion in July 2002,
3   the ALJ, without further inquiry of Dr. Mendoza, could not properly reject his
4   opinion on the same ground upon which he rejected Dr. Lugo's opinion, i.e., that it
5   was based solely on plaintiff's subjective complaints.[18]

6          Second, although defendant is correct that the length and timing of Dr.
7   Lugo's treatment relationship with plaintiff would have been permissible bases
8   upon which to assess and potentially reject Dr. Mendoza's opinion, the Ninth
9   Circuit has ruled that arguments such as the one defendant now makes are not
10  cognizable by the Court because they were not cited by the ALJ.  See Connett v.
11  Barnhart, 340 F.3d 871, 874 (9th Cir. 2003) (district court cannot affirm on the
12  basis of evidence the ALJ failed to discuss); Pinto v. Massanari, 249 F.3d 840, 847
13  (9th Cir. 2001) (court "cannot affirm the decision of an agency on a ground that
14  the agency did not invoke in making its decision").

15         Third, the Court cannot find the ALJ's error in assessing the opinion of Dr.
16  Mendoza to be harmless because had she considered and ultimately adopted such
17  opinion, it could have impacted, at a minimum, the step five analysis.  The
18  vocational expert testified that a person with the residual functional capacity
19  adopted by the ALJ for plaintiff could perform three jobs existing in significant
20  numbers in the national economy (i.e., cashier II, small parts assembler, and light
21  inspection).  (AR 23, 392-94).  If the person were further restricted to lifting a

22  ───────────────────

23         [18]Dr. Mendoza noted objective medical findings (i.e., plaintiff's MRI that showed disc
    bulges and degenerative disc disease with mild encroachment), when he concluded that plaintiff
24  should be limited to lifting no more than five pounds with back support.  (AR 162, 165).
    Similarly, the only other treating physician opinion in the record noting plaintiff's limitations –
25  that of Dr. Yegge – indicated that plaintiff should be precluded from heavy lifting.  (AR 298,
    300).  The Court observes that the ALJ rejected Dr. Yegge's opinion to the extent it expressed
26  limits pertaining to plaintiff's *cervical* spine as not supported by objective clinical findings.  (AR
    21).  However, Dr. Yegge specifically noted limitations related to plaintiff's *lumbar* spine of no
27  "heavy lifting," no "repetitive bending and stooping," and no "prolonged weight bearing."  (AR
    300).  To the extent the ALJ rejected Dr. Yegge's opinion concerning plaintiff's *lumbar spine*
28  limitations in finding that plaintiff retained a residual functional capacity with lesser limitations,
    the ALJ failed to explain any reasons therefor.

16

maximum of ten pounds, the vocational expert opined that the person still could perform the cashier II position. (AR 395) However, there is no indication in the record of whether a person who can lift only five pounds – as Dr. Mendoza assessed in plaintiff's case  – could perform the cashier II position.[19]

## V.    CONCLUSION

For the foregoing reasons, the decision of the Commissioner of Social Security is reversed in part, and this matter is remanded for further administrative action consistent with this Opinion.[20]

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: September 20, 2007

_____
                           /s/
                        Honorable Jacqueline Chooljian
                        UNITED STATES MAGISTRATE JUDGE

---

[19]The definition of the cashier II position in the Dictionary of Occupational Titles provides that it is a "light" strength position which requires exerting up to 20 pounds of force occasionally and up to 10 pounds of force frequently, and walking or standing "to a significant degree." See U.S. Department of Labor, Dictionary of Occupational Titles, listing 211.462-010 Cashier II and Appendix C  - Components of the Definition Trailer (4th ed., Rev. 1991), available at http://www.oalj.dol.gov (August 29, 2007).

[20]The Court has not reached any other issue raised by plaintiff except insofar as to determine that plaintiff's suggestion of reversal rather than remand is unpersuasive. When a court reverses an administrative determination, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Immigration & Naturalization Service v. Ventura, 537 U.S. 12, 16 (2002) (citations and quotations omitted). Remand is proper where, as here, additional administrative proceedings could remedy the defects in the decision. McAllister v. Sullivan, 888 F.2d at 603.

17